**UNITED STATES of America,
Appellee,**

v.

**Mannie GOLDBERG, Defendant-
Appellant.**

**No. 352, Docket 26738.**

United States Court of Appeals
Second Circuit.

Argued April 13, 1961.

Decided May 24, 1961.

Arnold Bauman, New York City (Bauman, Epstein & Rice, New York City, Frederick R. Biehl, New York City, on brief), for defendant-appellant.

Edward Brodsky, Brooklyn, N. Y. (Morton S. Robson, U. S. Atty. for the Southern District of New York, and Arthur I. Rosett, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before CLARK, MEDINA and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

■ The principal issue here is the sufficiency of the Government's evidence under the rule, applicable in prosecutions for perjury, "that one witness, without corroborating circumstances, does not suffice," 7 Wigmore, Evidence (3d ed. 1940), p. 273; Weiler v. United States, 1945, 323 U.S. 606, 608, 65 S.Ct. 548, 89 L.Ed. 495. Sufficient apart from this, it plainly was.

Goldberg was convicted on Counts I, II and IV of an indictment charging perjury in violation of 18 U.S.C. § 1621,

Count III having been dismissed by the Court. He was sentenced to three years' imprisonment on each count, the sentences to run concurrently, and was fined $2,000 on each count.

The allegedly perjured testimony was given in May and June 1956 before a Federal grand jury investigating possible violations of the laws relating to racketeering, 18 U.S.C. §§ 1951 and 371. The investigation appears to have been particularly concerned with the activities of one Abe Chait. Defendant Goldberg and Joseph Stern had formed a partnership to engage in the trucking business, known as Stern's Express Co., in August, 1945. The Government was endeavoring to find out from Goldberg whether Chait was responsible for Goldberg's entering into the partnership and whether Chait received any money from it; Goldberg denied both. Counts I and IV of the subsequent perjury indictment related to Goldberg's denials before the grand jury that he knew Chait before forming the partnership—Count I relating to a simple denial of such knowledge, and Count IV concerning a more circumstantial statement along the same lines, including an answer that Goldberg had first met Chait after formation of the partnership, when he would see Chait "walking through the street," Chait's own business having been "across the street," and a denial that Chait had anything to do with Goldberg's going into Stern's Express. Count II related to Goldberg's denial to the grand jury that Chait ever received any money from Stern's Express. The defense stipulated the materiality of the grand jury testimony.

The Government's case was presented through three witnesses: Joseph Stern, Irving Mishel, who had lived in the same apartment house as Goldberg and who had a long criminal record, and Earl L. Hassell, Jr., an F.B.I. agent who had analyzed the books and records of Stern's Express Co.

To support Counts I and IV, the Government produced testimony by Stern that Stern had seen Goldberg and Chait together once or twice, "talking nice,"

before August 1945 when Stern's Express started, and that the partnership was arranged at a meeting between Stern and Goldberg which Chait attended. For corroboration the Government relied on testimony given by Mishel, in a manner hereafter discussed, that Goldberg had told Mishel "that when he come out of the service he figured he was going to go back in the shylocking business but instead he met Big Dick who was connected with the Chaits * * * And Chait said 'Listen, I got a trucking business. I will put you in. We will work out a proposition.' So he went in to Stern's Express."

To establish Count II, the Government relied on three pieces of evidence:

(1) *Testimony by Mishel.* This was that Goldberg had told him Chait was getting money from Stern's Express— "something like" $200 a week, although "It could have been $150; it could have been $250."

(2) *Testimony by Stern.* He first said that, a few months after the formation of the partnership, there was discussion between Stern and Goldberg, at the latter's instance, as to some drawing for Chait in the form of expenses and that Goldberg had said "We got to get together" and "We will get together about what we are going to do about it." Then, having refreshed his recollection by reading his testimony before the grand jury, Stern added that he and Goldberg "agreed to a certain extent" that whenever they "drew money Abe Chait would draw money"; that "sometimes" Chait was going to draw as much as Stern and Goldberg; that "Sometimes business was bad, so we don't draw. Sometimes business was better, we draw more"; that Chait did not draw all the time but did draw "when business was better"; that Chait did not take out the same amount as Stern and Goldberg "all the time"; and that "everything was taken out of expenses." Further direct examination of Stern as a hostile witness on the basis of his grand jury testimony weakened rather than strengthened this, and cross-examination weak-

ened it more. Stern ended up by saying, in answer to an endeavor by the Court to reconcile his testimony on direct and on cross-examination, "I don't know whether he [Chait] got any money exactly."

(3) *Hassel's analysis of the distribution in the Cash Disbursements Book of Stern's Express Co. of the cash checks allocated to payroll, "expenses" and drawings.* This analysis showed that from August 3, 1945 to September 30, 1947, the drawings had been $200 and that, for each week except two, the unidentified "expenses" were at least $100 but rarely exceeded $135—the "expenses" for the last ten weeks of the period, for example, averaging $114. Commencing with the week ending October 7, 1947 and continuing through May 13, 1951, the drawings increased to $250, an equal division between Goldberg and Stern being shown from August 1, 1950. In that period, the amounts for unidentified "expenses" were never less than $125 and usually were rather more; in the ten weeks beginning October 7, 1947, for example, the average jumped from the $114 of the preceding ten weeks to $142. From May 22, 1951 through October 26, 1953, Goldberg's and Stern's drawings were increased to $150 each; coincidentally, the unidentified expenses, which had averaged $163.70 per week in the ten weeks before the increase, jumped to an average of $183.60 in the ten weeks thereafter— only on three occasions after May 22, 1951, were they less than $170 per week and never did they fall as low as $150.

We deal at this point with appellant's claim that the testimony of Mishel must be disregarded on the ground that Mishel had no present recollection but merely acknowledged he had given certain testimony before the grand jury. Although we may sympathize with the difficulties of a prosecutor in examining a witness who, if not actively hostile, was exceedingly timorous, we should have to sustain the legal contention if it were factually made out, United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 234, 60 S.Ct. 811, 84 L.Ed. 1129; West-

inghouse Electric Corp. v. Wray Equipment Corp., 1 Cir., 1961, 286 F.2d 491–493, certiorari denied 1961, 81 S.Ct. 1650; 5 Wigmore, Evidence (3d ed. 1940), § 1415. It is not. Although appellant's characterization may not be incorrect as to Mishel's direct testimony, Mishel went considerably further before leaving the stand. After sharp interrogation by the defense as to his criminal record, the witness experienced an access of what the jury could have regarded as either hostility or confidence. He thought it "about time that I tell the truth and that is it and I decided to tell the whole truth." When asked "Is it the truth that you recall or don't recall these conversations which you say you had with Mannie Goldberg about Chait, now as you sit here?", he responded "How many times did I say I recall it as being true and I recall it as being absolutely true"; and "Listen. Those things took place * * * These incidents took place 10, 12 years ago, counselor, and with all due respect to you, as you know, I had been under quite a bit of pressure the last few years. So I wanted to refresh." Finally when asked again whether he had any independent recollection, he replied, "I recall conversations between Mannie and myself and many other parties regarding Chait."

Appellant contends that the special evidentiary rule in perjury trials cannot be met by the testimony of one witness as to facts inconsistent with the truth of the allegedly perjurious utterance and of another witness as to an oral admission by the defendant, which was all the Government presented as to Counts I and IV; and still less by testimony as to an oral admission by the defendant plus circumstantial evidence, which the appellant urges and the Government, we think needlessly, seems to concede to have been the proof with respect to Count II. Disposition of these contentions will be aided if we first examine the rationale of the special perjury rule and the status of admissions by the defendant in perjury cases.

■ The historical origins of the rule that a conviction for perjury may not be had on the basis merely of "oath against oath," Rex v. Fanshaw, Skinn. 327 (1693); Rex v. Muscot, 10 Mod. 192 (1714); Weiler v. United States, supra, 323 U.S. at page 611, 65 S.Ct. at page 551, are illuminatingly described in 7 Wigmore, Evidence (3d ed. 1940), pp. 273–275. In our time the rule rests on society's obligation to protect a witness "from oppression, or annoyance, by charges of having borne false testimony," from those "against whom his evidence tells," Best, Evidence (1849), §§ 605–606, quoted in 7 Wigmore, Evidence, at p. 276. Logically that policy would be satisfied by requiring added proof only when the "oath" relied on by the prosecutor is that of a person in an adversary relation to the defendant. However, the rule clearly goes further; it is most accurately stated in the negative fashion that Wigmore employs, "one witness, without corroborating circumstances, does not suffice," p. 273. It differs from the special rule in treason trials in that two witnesses are not always required; indeed, a conviction may sometimes be had when there are none at all, United States v. Wood, 1840, 14 Pet. 430, 10 L.Ed. 527; United States v. Collins, 2 Cir., 1959, 272 F.2d 650, save as to the identity of physical objects having circumstantial relevancy.

■■ The special status of evidence of an admission in prosecutions for perjury rests upon the nature of the offense. The relevancy of a defendant's prior or subsequent statement of fact contrary to his testimonial assertion is that, in the absence of evidence of a change in defendant's knowledge, the jury may permissibly infer that one or the other utterance did not reflect defendant's belief at the time it was made. The difficulty is that, without more, there is no more reason for thinking the admission to have been true and the testimony false than the reverse. This reason underlies the holdings that a perjury conviction may not be had solely on the basis of oral admissions contrary to the allegedly per-

jurious statement, even if several witnesses testify to the admissions. Clayton v. United States, 4 Cir., 1922, 284 F. 537; Phair v. United States, 3 Cir., 1932, 60 F.2d 953.[1]

■■■ Examining the evidence on Counts I and IV in the light of this analysis, we see no basis for doubting that Stern's testimony that Goldberg had known Chait before the formation of the partnership was adequately corroborated by Mishel's testimony that Goldberg had admitted as much. The policy underlying the rule against a conviction simply by "oath against oath" is met when Stern's oath is supported by testimony of a second witness sufficient to "confirm the single witness' testimony and to induce the belief of it," 7 Wigmore, Evidence, p. 277, even though the testimony of the second witness is to a statement emanating from the defendant himself. And the objection that invalidates a perjury conviction resting solely on the basis of statements by the defendant of facts different from what he said under oath, namely, that, without more, there is no basis for the jury's finding the testimonial utterance rather than the inconsistent one to have been false, is inapplicable when the admission, always relevant but generally not alone sufficient, is used to corroborate testimony by another witness as to objective facts which themselves afford a basis for finding that the admission represented what defendant knew to be the truth. Under these circumstances the usual rule, that admissions "have such testimonial value as belongs to any testimonial assertion under the circumstances," 4 Wigmore, Evidence (3d ed. 1940), pp. 5–6, applies. Hence, as said in Vetterli v. United States, 9 Cir., 1952, 198 F.2d 291, 293, vacated and remanded on other grounds, 1952, 344 U.S. 872, 73 S.Ct. 175, 97 L.Ed. 675, "We do not believe an extra-judicial admission made by an accused is insufficient as corroboration simply because it is such."

■■■ With respect to Count II, appellant relies on the statement in Umbria-

---

1. In McWhorter v. United States, 5 Cir., 1952, 193 F.2d 982, this principle was held to require reversal of a conviction based upon an admission, proved by three witnesses, which not merely contradicted the allegedly perjurious statement but affirmatively stated the latter was false; the state cases on this are divided and we would not wish to be understood as necessarily agreeing with the McWhorter decision. The Court there sought to distinguish our affirmance of a conviction in United States v. Buckner, 2 Cir., 1941, 118 F.2d 468, where the admission of falsity was made by the defendant on the stand in the perjury trial.

It was said in United States v. Remington, 2 Cir., 1951, 191 F.2d 246, 249, in a discussion preliminary to the decision, that "the law is well settled that his [defendant's] declarations, if oral, will not satisfy the rule, although they will if written and adequately corroborated," citing United States v. Wood, supra. The first part of the statement accords generally with the cases cited above, although it is hard to see why in a case where, e. g., two or more witnesses testified that the defendant, repeatedly, and under varying circumstances, had made statements differing from his sworn testimony, a jury could

not be convinced beyond reasonable doubt that the defendant did not believe the latter to be true. One may equally doubt that a single written admission would invariably suffice. True, such an admission differs fom the usual extra-judicial oral admission in not being open to the general infirmities of mistake or prevarication by the declarant or to the "grudge" objection which affords the policy basis for the special perjury rule; but there is still the question whether the testimony or the admission was what defendant believed. The written materials in the Wood case in the Supreme Court were not "admissions" in the sense of recitals of the facts otherwise than the defendant had sworn; they were invoices and business letters which showed defendant knew the value of the goods to be more than the prices stated in his sworn customs entry. A fair case could be made that the rule with respect to conviction on admissions alone ought be simply that the court must be satisfied that the jury could reasonably be convinced beyond reasonable doubt that the admission represented defendant's true belief, plus, if the admission or admissions be oral, that it or they must be proved by more than a single witness.

co v. United States, 9 Cir., 1958, 258 F. 2d 625, 628 that "a corroborated, oral, unsworn admission of falsity" is never sufficient to support a conviction for perjury, no matter how strong the circumstantial corroboration may be. Although we have no difficulty with the result there reached, for reasons pointed out in the concurring opinion of Judge Pope, we think the rule is not so rigid as the majority assert. Any such view seems quite inconsistent with the Supreme Court's decision in United States v. Wood, supra, that there may be a conviction for perjury without the testimony of any "witness" at all when the circumstantial evidence is sufficiently probative.[2]

If the books of Stern's Express had contained a column labelled as payments to Chait, that would have been enough to support a conviction without the testimony of any witness save as to their authenticity. United States v. Wood, supra; United States v. Collins, supra. The same would be true if the books had contained a code reference to Chait and a witness supplied the key to the code. We would suppose, therefore, the Government here could bring itself within United States v. Wood by combining the book entries of Stern's Express with Mishel's testimony as to an admission by Goldberg which could convince the jury beyond reasonable doubt that the effect of the records was the same as if Chait's name had appeared, or, putting the matter more broadly, that the objection to a perjury conviction solely on the basis of an admission is removed by records, or other circumstantial evidence, affording a basis for the jury's being convinced beyond reasonable

doubt that the admission represented defendant's true belief and the testimonial assertion was the falsehood.

However, this case does not require us to go so far. There was more evidence on Count II than Mishel's testimony as to the admission about payments to Chait and the compelling inference from the course of the book entries in the light of that.[3] As previously noted, Stern testified that payments were made to Chait; to be sure, his testimony was halting and was weakened on later examination, but that was for the jury to weigh under all the circumstances, on instructions as to which appellant makes no complaint. Hence Stern provided the testimony of one witness as to the objective facts on Count II, as he had on Counts I and IV, and the books would have been sufficient corroboration alone, a fortiori when coupled with defendant's admission to Mishel. See Arena v. United States, 9 Cir., 1955, 226 F.2d 227; 7 Wigmore, Evidence (3d ed.), § 2042(2).

The chief of appellant's other points is that he was prejudiced when the prosecutor, knowing that Mishel was following a transcript of his own grand jury testimony, asked a question bound to elicit a reading of the answer, quoted above, which included the word "shylocking." Appellant contends this imputed to him the commission of the crime of usury, New York Penal Law, McKinney's Consol.Laws, c. 40, § 2400, and that the prejudice was later compounded; after the jury had requested a reading of the testimony as to when appellant had met Chait and had retired without having been read the offending passage, which the reporter had not yet found, they were then recalled to hear it. A short answer

---

2. It was there said, 14 Pet. at page 440, 10 L.Ed. 527, "If we will but recognize the principle upon which circumstances, in the case of one witness, are allowed to have any weight, that principle will carry us out to the conclusion, that circumstances, without any witness, when they exist in documentary or written testimony, may combine to establish the charge of perjury; as they may combine,

altogether unaided by oral proof, except the proof of their authenticity, to prove any other fact connected with the declarations of persons, or business of human life."

3. Appellant's argument that the total expenses of the business were increasing fails to account for the synchronization of the jumps in unidentified "expenses" with increases in the partners' drawings.

to the first complaint is that defense counsel, who also had a copy of the grand jury transcript before him, instead of merely objecting generally to the prosecutor's clearly proper question "Did the defendant ever tell you that Abe Chait put him into Stern's Express?", could have asked that the witness be cautioned or could have immediately moved to strike or requested an appropriate admonition to the jury. Furthermore, we do not think the jury would have taken the alleged reference to "shylocking" as an admission of previous crime. The later reading of this portion of the transcript to the jury was entirely innocent; it clearly fell within the jury's request, as defense trial counsel properly conceded, and the Court warned the jury that the reading was not to be considered as emphasizing this testimony, which must be taken by them in conjunction with all the rest.

 We likewise find no merit in appellant's objections to the Court's failure to hold a hearing to settle the record. The material alleged not to have been taken down by the reporter consisted of colloquy between the jury and the judge when the jury asked that certain of the testimony be read. No point was made of this omission of the reporter until the above-mentioned testimony of Mishel was located. After the trial Judge Dawson reviewed the transcript and stated in a memorandum that, with two exceptions noted by him, it was correct; this procedure was proper under F.R.Crim.Proc. 39(b) (1), 18 U.S.C.A. and F.R.Civ.Proc. 75(h), 28 U.S.C.A. Moreover, appellant has not pointed to anything in the colloquy alleged to have been omitted that could affect our decision.

Affirmed.

MEDINA, Circuit Judge (concurring).

I concur in the affirmance of the judgment of conviction and agree with the reasoning of my brother Friendly's opinion and the principles stated therein. What troubles me somewhat is the statement: "If the books of Stern's Express had contained a column labelled as pay-ments to Chait, that would have been enough to support a conviction without the testimony of any witness save as to their authenticity." The facts of the two cases cited in support of this statement, United States v. Wood, 1840, 14 Pet. 430, 10 L.Ed. 527, and United States v. Collins, 2 Cir., 1959, 272 F.2d 650, appear to me to be "far stronger, more cogent and more convincing," 272 F.2d at page 652, than the direct testimony of one witness together with some corroborating proof, in accordance with the rule commonly applied in perjury cases. Whether or not this would be the case on my brother Friendly's hypothesis might well depend upon a variety of attendant circumstances, and upon what constitutes the proof of authenticity in a particular case. I would prefer to cross that bridge when we come to it.